**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| _____ ) | |
| SECURITIES AND EXCHANGE ) | |
| COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | |
| OSCAR F. VILLARREAL, ) | |
| ) | Jury Trial Demanded |
| Defendant. ) | |
| _____ ) | |

## COMPLAINT

Plaintiff, Securities and Exchange Commission ("Commission"), alleges:

## SUMMARY

1.      This case involves three fraudulent offerings of securities, the theft of investor funds, and breaches of fiduciary obligations by Defendant Oscar F. Villarreal ("Villarreal"), a man with a talent for using lies and his charm to separate investors from their money. Villarreal's fraud, which spanned from at least 2009 through 2013, included his raising of $18.4 million from 51 investors, mostly from the Cleveland, Ohio area, based on lies and deceit.

2.      In the first fraudulent offering, conducted from at least March 2009 through December 2010, 46 investors invested $9.2 million in limited partnership units in WW Capital

III, LP ("Fund III").  Villarreal told Fund III investors that their money would be used to make private equity investments in companies in the petroleum, steel, real estate, or infrastructure industries in Mexico.  One of Villarreal's companies was the general partner of Fund III.

3.      Villarreal, however, lied to, and stole from, the Fund III investors.  Among other things, Villarreal: a) lied to Fund III investors about the success of his previous investment offering in debentures from WW Capital Partners LLC ("Fund II"); b) used $7.4 million of Fund III investor funds to trade in publicly-traded securities in a brokerage account—contrary to his representations to investors—and sustained heavy losses; c) stole $5.8 million in cash and securities for himself and companies he owned that were unrelated to Fund III; d) lied to investors by telling them he used their money to purchase and profitably operate a Mexican pipeline manufacturer; and e) lied to investors by telling them that Fund III had ownership interests in several U.S. and Mexican oil drilling companies.  By November 2011, Fund III was essentially insolvent.

4.      In the second fraudulent offering, Villarreal offered limited partnership units in Standard Asset Management Fund I, LP ("SAM Fund") to investors.  One of Villarreal's companies was the initial general partner of the SAM Fund and was later replaced by another of Villarreal's companies.

5.      From at least November 2010 through March 2011, nine investors invested $3.7 million in the SAM Fund.

6.      From January 2011 to May 2011, two investors ("Advisory Clients") signed advisory agreements with Villarreal's company, SAM LLC, put $5.5 million in brokerage accounts they opened, and gave Villarreal investment discretion over these accounts.  Villarreal,

through SAM LLC, promised to trade securities in these accounts in conjunction with his trading in the pooled SAM Fund.

7.      Villarreal told SAM Fund investors and the Advisory Clients that the SAM Fund would invest in companies listed on the Mexican stock exchange, especially those in industries related to oil and steel, or U.S. companies with significant operations in Mexico.

8.      Villarreal defrauded the SAM Fund investors and Advisory Clients.  Among other things, Villarreal repeated his earlier lies about Fund II and about Fund III's purported acquisition and profitable operation of a Mexican pipeline manufacturer.  Villarreal also stole at least $327,000 of SAM Fund assets for his personal use.

9.      Villarreal's trading on behalf the SAM Fund investors and Advisory Clients was a massive failure.  By May 2012, the SAM Fund investors lost 83% of their investments.

10.     In the third fraudulent offering, between March 2012 and May 2012, Villarreal defrauded the SAM Fund investors by offering to "exchange" the limited partnership ("LP") units he claimed he owned in Fund III for the SAM Fund investors' LP units in the SAM Fund (which still had some value).  Among other things, Villarreal lied about how many Fund III LP units he owned and the value of the Fund III units.  Villarreal did not disclose to these investors that the Fund III LP units were worthless.

11.     Eight SAM Fund investors accepted Villarreal's offer.  Based on Villarreal's lies, they "exchanged" their SAM Fund LP units, which they had purchased for a total of $3.1 million.

12.     By this misconduct, Villarreal violated the antifraud provisions of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), and the Investment Advisers Act of 1940 ("Advisers Act").

## JURISDICTION AND VENUE

13.     The Commission brings this action pursuant to Section 20(b) of the Securities

Act, 15 U.S.C. § 77t(b), Sections 21(d) and 21(e) of the Exchange Act, 15 U.S.C. §§ 78u(d) and

78u(e), and Sections 209 and 214 of the Advisers Act, 15 U.S.C. §§ 80b-9 and 80b-14.

14.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act, 15 U.S.C. § 77v(a), Sections 21(d)(3), 21(e), and 27 of the Exchange Act, 15

U.S.C. §§ 78u(d)(3), 78u(e), and 78aa, and Sections 209 and 214 of the Advisers Act, 15 U.S.C.

§§ 80b-9 and 80b-14.  Villarreal, directly or indirectly, made use of the means and

instrumentalities of interstate commerce or of the mails in connection with the acts, transactions,

practices, and courses of business alleged in this complaint.

15.     Venue in this District is proper pursuant to Section 22 of the Securities Act, 15

U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 214 of the Advisers

Act, 15 U.S.C. § 80b-14, because a substantial part of the events or omissions that give rise to

claims alleged in this Complaint occurred in this district.  Assignment to the Eastern division

(Cleveland) is appropriate because most of the illicit activities occurred in Cuyahoga County.

## DEFENDANT

16.     **Oscar F. Villarreal**, age 29, is a Mexican citizen who resided in Gates Mills,

Ohio based on an E-2 (entrepreneur) visa.  In approximately September 2013, he moved to

Mexico, where he lives currently.

## FACTS

### Villarreal's Background

17.     In 2002, Villarreal, while still in high school, moved from Mexico to the Cleveland area.

18.     While a college student, Villarreal met many prominent members of Cleveland's business and civic communities.  Villarreal ingratiated himself with them, joining their clubs and charitable organizations, and impressing them with his purported connections to Mexican business interests and his claims of having an elite pedigree.  As a result of the relationships he cultivated, a number of these individuals later invested in Villarreal's Fund II, Fund III, and SAM Fund offerings.

### Fund II Offering

19.     In early 2008, Villarreal formed WW Capital Partners, LLC ("WWCP") and began offering debentures to investors in the Cleveland area, telling them that the money raised would be used to purchase surplus metal products in Mexico for resale.

20.     In May and June 2008, based on Villarreal's representations, six investors invested $550,000 in Fund II.

21.     In January and February 2009, as part of Villarreal's scheme to induce Fund II investors to invest in Villarreal's new Fund III offering, he sent $715,000 to Fund II investors, representing a 30% return.  However, the distribution did not come from the purchase or resale of surplus metal products.  Instead, Villarreal funded $455,000 of the distribution with unrelated income and funded the remaining $260,000 from his personal line of credit at a local bank.

22.     Villarreal did not disclose to Fund II investors the actual sources of the distribution.

23.     All six Fund II investors later invested in Villarreal's subsequent Fund III offering.  Fooled into believing that Fund II had been a success, several of these investors enthusiastically endorsed Villarreal to their friends, some of whom also invested in Fund III.

### Fund III Offering

24.     In the spring of 2009, Villarreal began offering LP units in Fund III.

25.     Villarreal devised and orchestrated a fraudulent scheme to raise millions of dollars from Fund III investors.  An essential element of the scheme was to identify prospective investors to whom he could offer the Fund III LP units.  To accomplish this, Villarreal solicited his Fund II investors whom he had already duped into believing that Villarreal had generated a 30% return on investment for them.

26.     Villarreal also recruited one of the Fund II investors to solicit investors for Fund III.  Villarreal's plan worked.  All six Fund II investors invested in Fund III, and the other Fund III investors accepted Villarreal's offer in part because of the word-of-mouth of his Fund II investors.

27.     To facilitate the sale of the Fund III investments, Villarreal directed the drafting and distribution of offering documents to investors (collectively, "Fund III offering documents").  Villarreal himself drafted the sections of these documents related to Fund II.  Villarreal also personally distributed these written materials to some of the investors.  Villarreal knew these offering documents contained material misrepresentations and omitted to disclose material facts.

28.     According to Villarreal and the Fund III offering documents, the investors' money was to be pooled and used to make private equity investments in companies in the petroleum,

steel, real estate, or infrastructure industries in Mexico.  Villarreal told investors their returns would come from the profits generated by the investments he made with their funds.

29.     Between March 2009 and December 2010, Villarreal raised $9.2 million from 46 investors in the Fund III offering.

30.     Villarreal, however, lied to Fund III investors by telling them that Fund III actually raised $15.84 million, with the additional $6.78 million coming from a purported group of Mexican investors.

31.     In truth, there were no Mexican investors in Fund III, and no additional investment of $6.78 million.

32.     Villarreal acted as an investment adviser to Fund III.  Under the terms of the Fund III offering documents, one of Villarreal's companies, which Villarreal controlled, had exclusive authority over Fund III's business, including making all investment decisions on behalf of Fund III.  In exchange for making such investment decisions, Villarreal received compensation, including fees and incentive distributions.

### Misrepresentations about the Earlier Fund II

33.     From at least May 2009 through December 2010, Villarreal made misrepresentations to potential Fund III investors concerning his earlier Fund II.

34.     Villarreal made these misrepresentations orally at meetings with potential investors and in offering materials which he partially drafted (specifically, the sections about Fund II), reviewed, approved, and directed to be distributed or distributed himself.

35.     Villarreal falsely told potential Fund III investors that there had been 12 Fund II investors, including Villarreal, and that an aggregate of $6.8 million had been invested.

36.     In truth, there were only six Fund II investors, who invested a total of $550,000.

37.    Villarreal lied to potential Fund III investors by telling them that all of the Fund II investors' money had been used to purchase a steel service center and a pipeline manufacturer that sold pipes to Pemex, the Mexican state-owned petroleum company.

38.    Villarreal did not use Fund II money to purchase a steel service center or a pipeline manufacturer, however.

39.    Villarreal also lied when he told Fund III investors that the steel service center and pipeline manufacturer were sold in September 2008 and that the sale proceeds, combined with profits from the companies' operations, resulted in an $8.8 million distribution paid to investors in January 2009.

40.    Fund II investors did not receive an $8.8 million distribution.  In fact, Villarreal sent only $715,000 to the Fund II investors which represented a total "return" to investors of only $165,000.  Further, as discussed above, Villarreal paid the Fund II investors using money from a personal line of credit and other unrelated income.

### Misuse of Fund III Investor Funds

41.    Despite what he promised investors, Villarreal did not use Fund III's assets to make private equity investments in companies in the petroleum, steel, real estate, or infrastructure industries in Mexico.

42.    Instead, Villarreal used most of Fund III's assets to trade in the securities of publicly traded U.S. and Mexican companies and exchange-traded funds.  He stole the rest of Fund III's assets for himself and for companies he controlled that were unrelated to Fund III.

43.    In September 2009, Villarreal formed TAINSA Investment Company, LLC ("TAINSA Investment") and opened a brokerage account in its name in November 2009. Villarreal controlled the brokerage account.  From November 2009 through April 2010,

Villarreal transferred $7.4 million of Fund III assets to the brokerage account.  Villarreal suffered massive trading loses in this account, losing $3.4 million.

44.     Villarreal never disclosed to investors the existence of TAINSA Investment, the brokerage account, or the trading and losses in it.

45.     As part of Villarreal's fraudulent scheme, from July 2009 to November 2011, Villarreal stole for his personal use, or for companies he controlled that were unrelated to Fund III, at least $5.8 million of Fund III assets in the form of money and securities.  Villarreal controlled all of the financial accounts which contained Fund III investor funds.  Among other things, Villarreal used more than $600,000 of these funds to pay his personal credit card balances and $360,000 for mortgage and car payments.

46.     For example, in April 2010, Villarreal transferred Fund III assets to his personal bank account, and then immediately used $104,000 of these assets to purchase a new BMW luxury car.  Villarreal did not already have sufficient funds in his personal account to pay for the car.

47.     Although the Fund III offering documents provided that Villarreal's company managing the fund was entitled to asset management fees and incentive distributions, the money and securities that Villarreal stole were far in excess of what his company was entitled to receive.

### Misrepresentations about Fund III

48.     The number and scope of Villarreal's lies to his Fund III investors only increased after they invested.  In letters and reports and during meetings with investors from August 2009 until at least August 2013, virtually everything Villarreal told investors about Fund III was a lie: how he spent Fund III's assets, what assets he claimed Fund III owned, and the value of these assets and the investors' Fund III LP units.

**Lies about TAINSA-MX**

49.     From August 2009 through at least August 2013, Villarreal told Fund III investors that he bought a Mexican company named "Tubos y Aceros Industriales del Norte, S.A. de C.V." ("TAINSA-MX") using Fund III money.  Villarreal told Fund III investors that Fund III wholly owned TAINSA-MX, having paid $6 million in cash and $2 million in seller financing.

50.     In fact, however, Villarreal did not use Fund III assets to purchase TAINSA-MX.  Neither Villarreal, Fund III, nor anyone acting on their behalf ever purchased, owned or operated TAINSA-MX.

51.     From September 2009 through at least August 2013, Villarreal's lies about Fund III owning TAINSA-MX formed the foundation for many of his subsequent misrepresentations to Fund III investors.  The following includes some of Villarreal's misrepresentations to Fund III investors related to TAINSA-MX, all of which were lies because Fund III never had any ownership interest in TAINSA-MX:

        a.     From at least December 2009 through at least March 2013, Villarreal told investors that he was operating TAINSA-MX on Fund III's behalf, that TAINSA-MX's revenues and profits were increasing, and that he was paying down TAINSA-MX's debt.

        b.     In December 2009, Villarreal told investors that an increase in TAINSA-MX revenues allowed him to make a distribution to investors.  In January 2010, Villarreal caused Fund III to send a total of $164,000 to the Fund III investors.  While this distribution was relatively small—ownership of one LP unit resulted in a distribution of only $4,595—investors were pleased to learn that their investment was being put to profitable use.  In reality, as part of Villarreal's fraudulent scheme, he simply took Fund III money from a brokerage account and

sent it back to the investors.  In other words, all Villarreal did was send investors a small part of their money back, yet falsely claimed the money came from TAINSA-MX revenues.

        c.      Villarreal announced in January 2011 that he would order a second distribution to Fund III investors of $2.5 million to be funded in part by revenues from TAINSA-MX.  In June 2011, Villarreal told investors in a letter that he was cancelling this second distribution and would instead use the money "to finance upcoming projects in our business pipeline."  During this period, Fund III did not have $2.5 million.

        d.      In October 2011, Villarreal claimed to have had TAINSA-MX audited by an independent third-party accounting firm in Mexico, and included what he claimed was the audit report.  Among other things, the report stated that TAINSA-MX had over $274 million (MXN) in assets, $786,000 (MXN) in liabilities, and $67 million (MXN) in income for the period August 2010 to August 2011.  The audit was fabricated, however.

        e.      Beginning in February 2012, Villarreal claimed that TAINSA-MX—and, derivatively, Fund III—had purchased stakes in four profitable drilling companies.  In fact, Fund III had no ownership interest in any of these drilling companies.

### Lies about Fund III's Ownership of Stock in a Mexican Conglomerate

52.      In a January 27, 2010 letter, Villarreal issued a second capital call to Fund III investors.  In it, Villarreal stated that a portion of the money would be used to invest in the common stock of Company A, a publicly traded Mexican construction conglomerate.  Villarreal explained to Fund III investors in the letter that the investment in a publicly traded company would create a "strategic partnership" with Company A that would increase Fund III's chances of participating in larger-scale Mexican government contracts.  Investors sent $4 million to Fund III from January to March 2010 in response to the capital call.

53.     For the next two years, June 2010 to October 2012, Villarreal lied to Fund III investors about Fund III's purported purchase of, and holdings in, Company A stock.  Villarreal told Fund III investors orally and in writing that he had used approximately $8 million of Fund III investor money to purchase more than 850,000 shares of Company A stock in March 2010. Villarreal then told Fund III investors that the fund continuously held over 675,000 shares of Company A stock until it purportedly sold the shares sometime between February 2012 and October 2012.

54.     The truth was very different.  After receiving $4 million—not $8 million—from investors in response to the January 2010 capital call, Villarreal transferred the money to a brokerage account.  However, he then purchased only 700 shares of Company A stock for a total of $6,975.  Moreover, Fund III never owned any Company A shares after March 2010, contrary to Villarreal's claims that it owned hundreds of thousands of shares through October 2012.

### Lies about ICM SP

55.     During a January 2012 investor meeting, Villarreal told Fund III investors that he had started a drilling company named ICM Servicios Petroleros, S.A. de C.V. ("ICM SP"). During the same meeting, and in subsequent communications with Fund III investors, Villarreal told Fund III investors that ICM SP was partially owned by Fund III.

56.     At no time, however, did Fund III have any ownership interest in ICM SP. Rather, it was owned by Villarreal through two of his other entities, neither of which Fund III had a stake in.

57.     In a February 2012 letter to Fund III investors, Villarreal wrote that ICM SP and another of Villarreal's companies, WWCP, had been awarded two contracts by Pemex and that together they were worth potentially more than $100 million.

58.     In a letter to investors in June 2012, however, Villarreal wrote that the two losing competitors for the Pemex contracts had filed a lawsuit against Pemex for having awarded the contracts to ICM SP and WWCP.

59.     In October 2012, Villarreal wrote to investors and explained that the competitors' litigation against Pemex prevented ICM SP and WWCP from servicing the contracts until the litigation was completed.

60.     Villarreal's representations to Fund III investors about ICM SP were simply an attempt to lull them into believing that Fund III had an ownership interest in a soon-to-be successful Mexican drilling company.

61.     Villarreal lied to the investors about what prevented ICM SP and WWCP from servicing the Pemex contracts.  The "litigation" that Villarreal referenced was, in fact, an investigation by Pemex into the very bids that WWCP and ICM SP submitted.

62.     This investigation found that Villarreal submitted forged documents to Pemex in December 2011 in support of the bids.  These included falsified contracts and invoices for two drilling projects Villarreal claimed WWCP had completed for certain companies.  In fact, Villarreal concocted these companies, and WWCP did not perform any drilling projects for anyone.

63.     As part of Villarreal's fraudulent scheme, he also fabricated the existence of a WWCP employee, whom Villarreal claimed to Pemex had over a dozen years of experience in the oil industry, and went so far as to submit to Pemex copies of a fake resume, driver's license, and a copy of a college diploma.  The diploma, in actuality, belonged to a man with no connection to Villarreal.

64.     In October 2012, Pemex suspended ICM SP and WWCP from bidding or servicing any contracts for 20 months.  Villarreal did not disclose this suspension, let alone the reason for it, to Fund III investors.

### Lies about Fund III's Value and Assets

65.     From August 2009 through at least August 2013, Villarreal repeatedly lied to Fund III investors by telling them that Fund III owned assets that it did not actually own (i.e. TAINSA-MX and Company A stock) and by vastly overstating the value of each investor's investment.

66.     In different written reports to investors, Villarreal represented that a single LP unit, initially valued at $250,000, had increased in value to $283,000 (as of December 2011), then $442,000 (as of June 2012) and then declined slightly to $441,000 (as of March 2013).  The K-1 tax forms issued by Villarreal's accounting firm to Fund III investors reflected these purported increases in value.

67.     These representations about the value of Fund III investors' investments were false because by November 2011, the combination of Villarreal's unprofitable securities trading and stealing of fund assets had rendered Fund III essentially insolvent.

68.     In addition, Fund III did not have any ownership interest in the various companies Villarreal claimed Fund III owned.

69.     Lastly, after March 2011, Fund III's bank account never held more than $1,800 at any one time.  As a consequence, the LP unit values Villarreal provided investors were drastically overstated, as were the K-1 tax forms issued to the investors.

### Villarreal Offers the SAM Fund

70.     In mid-2010, Villarreal began offering for sale LP units in the SAM Fund.

71.     To facilitate the sale of the SAM Fund investments, Villarreal supervised the drafting of offering documents to investors (collectively, "the SAM Fund offering documents"). Villarreal himself drafted the sections of these documents related to Fund II and Fund III.  He also approved the final versions of these documents and authorized his staff to distribute the materials to investors.  Villarreal also personally distributed these written materials to investors. Villarreal knew these offering documents contained material misrepresentations and omitted material facts.

72.     According to Villarreal's oral representations, as well as written representations in the SAM Fund offering documents, the investors' money was to be pooled and used to invest and trade in the securities of companies listed on the Mexican stock exchange, especially those in industries related to oil and steel, or in U.S. companies with significant operations in Mexico. Villarreal told investors their returns would come from the profits generated by the investments he made with these funds.

73.     An essential element of Villarreal's SAM Fund scheme was to identify prospective investors to whom he could offer the SAM Fund LP units.  To accomplish this, Villarreal solicited his Fund III investors whom he knew mistakenly believed that Fund III had profitably invested in Mexico.

74.     Starting in August 2010, Villarreal held meetings with potential SAM Fund investors comprised of Fund III investors, other individuals, and corporations to solicit investments in the SAM Fund.

75.     The SAM Fund attracted $3.7 million from nine investors from November 2010 through March 2011.  Six of these investors had previously invested in Fund III.

76.     Villarreal, through companies he owned and controlled, acted as an investment adviser to the SAM Fund.  The SAM Fund's offering documents stated that Villarreal's companies, which Villarreal controlled, had exclusive authority over the SAM Fund's business, including making all investment decisions.  Villarreal made all business and investment decisions for the SAM Fund.  In exchange for making such investment decisions, Villarreal accepted compensation, including fees and performance allocations.

### Villarreal Attracts Two Advisory Clients

77.     Two potential SAM Fund investors told Villarreal that they were interested in investing, but did not want their money pooled with the other SAM Fund investors.  Instead, these two Advisory Clients signed advisory agreements with SAM LLC in January 2011.

78.     SAM LLC and Villarreal were investment advisers and fiduciaries to the Advisory Clients.  Under these advisory agreements, Villarreal, through SAM LLC, had the authority to buy and sell securities within the Advisory Clients' accounts at his discretion.  However, the advisory agreements specifically stated that the Advisory Clients' funds were to be invested and managed in conjunction with the SAM Fund and in accordance with the terms of the SAM Fund private placement memorandum.  Villarreal received compensation for managing the Advisory Clients' investments.

79.     Villarreal met the Advisory Clients and their representatives prior to the Advisory Clients signing advisory agreements.  Villarreal made oral representations during these meetings about Fund II, Fund III, and the SAM Fund.  In addition, Villarreal personally distributed, or ordered his staff to distribute, the SAM Fund offering documents to the Advisory Clients.

80.     Villarreal's trading was a massive failure.  By May 2012, the SAM Fund investors lost 83% of their investments, and the Advisory Clients also suffered large losses.

81.     Villarreal shut the SAM Fund down in June 2012.

### Villarreal's Pre-Investment Misrepresentations to
### Potential SAM Fund Investors and Advisory Clients

82.     From August 2010 through at least March 2011, Villarreal made numerous

misrepresentations to potential SAM Fund investors and Advisory Clients concerning Fund II

and Fund III.  Villarreal made many of these misrepresentations orally at meetings with potential

SAM Fund investors and Advisory Clients.  Villarreal also drafted much of the false Fund II and

Fund III-related content for the SAM Fund offering documents.

83.     Among other things, Villarreal falsely told potential SAM Fund investors and

advisory clients that Fund III had acquired TAINSA-MX, profitably operated it, had obtained a

contract with Pemex to repair pipelines, and that TAINSA-MX's operations funded a $400,000

distribution to Fund III investors in January 2010.  He did not disclose that he misused Fund III

money to trade in publicly listed securities or the massive losses that resulted.  Villarreal also

repeated his lies about Fund III's purported purchase, sale, and holdings of Company A stock.

### Villarreal Misappropriates and Misuses SAM Fund Assets

84.     Between April 2011 and June 2012, as part of Villarreal's fraudulent scheme, he

transferred at least $590,000 from the SAM Fund bank account, which he controlled, to other

accounts he controlled.  Of this money, Villarreal ultimately sent $327,000 to his personal bank

account, having first routed it through a bank account in the name of another company he

controlled.

### Villarreal Lies to SAM Fund Investors in Connection with His
### Offer to Exchange Fund III LP Units for SAM Fund LP Units

85.     In early 2012, after the SAM Fund had sustained heavy losses, Villarreal made a

written offer to SAM Fund investors which he claimed would make them "whole."

86.     As part of Villarreal's fraudulent scheme, he offered to "convey" to each SAM Fund investor an amount of Fund III LP units equivalent in value to the investors' initial investment in the SAM Fund.  Villarreal represented that he personally owned these Fund III LP units.  In exchange, the SAM Fund investors would transfer their SAM Fund LP units to Villarreal.

87.     Despite Villarreal's unprofitable trading and his theft and misuse of SAM Fund money, the SAM Fund LP units still had some value at the time.

88.     Between March 2012 and May 2012, eight SAM Fund investors, who had invested a total of $3.1 million, agreed to Villarreal's offer, seeing this as an opportunity to recover their SAM Fund losses.  In June 2012, the sole SAM Fund investor who declined Villarreal's exchange offer received the approximately $89,000 that remained of his initial $1 million investment.

89.     Villarreal and the SAM Fund investors signed "General Conveyance and Assignment Agreements" in which Villarreal represented that he owned an amount of Fund III LP units equivalent to the value of each investor's original SAM Fund investment.

90.     Villarreal falsely told the SAM Fund investors in writing that one Fund III LP unit had a book value of more than $286,000.

91.     In addition, since 2009, the five remaining SAM investors who had also been Fund III investors had heard, read, and believed Villarreal's lies about Fund III owning and operating profitable assets in Mexico and the U.S., including ownership interests in TAINSA-MX and ICM SP.

92.     Villarreal's representations were false.  At the time he made his offer to the SAM Fund investors, Villarreal owned less than half of one Fund III LP unit.  Also, at the time

Villarreal made his offer to SAM Fund investors, Fund III had few actual assets, and, consequently, Fund III LP units had only a negligible book value.  Contrary to Villarreal's representations, Fund III did not have any ownership interest in TAINSA-MX or ICM SP.  At the time he made the exchange offer, the combined bank and brokerage accounts for Fund III and related companies, all of which Villarreal controlled, held less than $10,000 in cash and no securities.

93.     On February 7, 2014, Villarreal transferred money to the Fund III investors equal to their principal investment, including the SAM Fund investors who transferred their SAM Fund LP units.  Because Fund III had no assets, Villarreal had to repay the investors with money that had been loaned to one of his unrelated Mexican drilling companies by two parties for purposes wholly unrelated to Fund III or the SAM Fund.  Villarreal refused to tell the investors the source of this money.

## CLAIMS FOR RELIEF

### COUNT I

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]
and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder**

94.     The Commission realleges and reincorporates by reference each allegation set forth above.

95.     By engaging in the conduct described above , Villarreal, directly or indirectly, singly or in concert with others, by use of the means or instrumentality of interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, has: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they

were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

96.     Villarreal knew or was reckless in not knowing of the activities described herein.

97.     By reason of the foregoing, Villarreal violated, and unless enjoined will likely again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### COUNT II

**Violations of Section 17(a)(1), (2) and (3) of the Securities Act**
**[15 U.S.C. § 77q(a)(1), (2) and (3)]**

98.     The Commission realleges and reincorporates by reference each allegation set forth above.

99.     By engaging in the conduct described above , Villarreal, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, has: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

100.    Villarreal knew or was reckless or was negligent in engaging in the activities described herein.

101.    By reason of the foregoing, Villarreal violated, and unless enjoined will likely again violate, Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1), § 77q(a)(2) and § 77q(a)(3)].

## COUNT III

**Violations of Section 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1), (2)]**

102.    The Commission realleges and reincorporates by reference each allegation set forth above.

103.    At all relevant times, Villarreal acted as an "investment adviser" within the meaning of Section 202(a)(ll) of the Advisers Act [15 U.S.C. § 80b-2(a)(ll)].

104.    By engaging in the conduct described above, Villarreal, while acting as an investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly: (a) employed devices, schemes, or artifices to defraud clients or prospective clients; and (b) engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon clients or prospective clients.

105.    Villarreal knew or was reckless or was negligent in engaging in the activities described herein.

106.    By reason of the foregoing, Villarreal has violated and, unless enjoined, will likely again violate, Section 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1), (2)].

## COUNT IV

**Violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]**

107.    The Commission realleges and reincorporates by reference each allegation set forth above.

108.    By engaging in the conduct described above, Villarreal, while acting as an investment adviser, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce, engaged in acts, practices, or courses of business that were fraudulent deceptive, or manipulative.

109.    By engaging in the conduct described above, Villarreal, while acting as an investment adviser to a pooled investment vehicle: (a) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors in the pooled investment vehicle; and (b) engaged in acts, practices and courses of business that were fraudulent, deceptive, or manipulative with respect to investors in the pooled investment vehicle.

110.    Villarreal knew or was reckless or was negligent in engaging in the activities described herein.

111.    By reason of the foregoing, Villarreal has violated, and unless enjoined, will likely again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

### **RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that the Court:

a.    Issue findings of fact and conclusions of law that Villarreal committed the violations charged and alleged herein.

b.    Enter an Order of Permanent Injunction restraining Villarreal, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, who receive actual notice of the Order, by personal service or otherwise, from, directly or indirectly, engaging in the transactions, acts, practices or courses of business

described above, or in conduct of similar purport and object, in violation of Section 10(b) of the

Exchange Act [15 U.S.C. §78j(b)] and Rules l0b-5(a),(b), and (c) thereunder [17 C.F.R. §

240.10b-5(a), (b), and (c)], Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section

206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1), (2)], and Section 206(4) of the

Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

  c.  Enter an Order requiring Villarreal to disgorge the ill-gotten gains that he

received, directly or indirectly, as a result of his wrongful conduct, plus prejudgment interest.

  d.  Enter an Order imposing appropriate civil penalties upon Villarreal pursuant to

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], Section 20(d) of the Securities

Act [15 U.S.C. § 77t(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

  e.  Grant such orders for further relief the Court deems appropriate.

## JURY DEMAND

  Pursuant to Rule 39 of the Federal Rules of Civil Procedure, the SEC demands that this

case be tried before a jury.

           Respectfully submitted,

DATED: August 26, 2014      s/Eric M. Phillips
           ERIC M. PHILLIPS (IL Bar # 6237871)
           STEVEN L. KLAWANS (IL Bar # 6229593)
           TRACY W. LO (IL Bar #6270173)
           JAMES G. O'KEEFE (IL Bar # 6293490)
           Attorneys for Plaintiff
           U.S. SEC
           175 West Jackson Boulevard, Suite 900
           Chicago, Illinois 60604
           Telephone: (312) 353-7390
           Facsimile: (312) 353-7398
           Email: Phillipse@sec.gov
           Email: Klawanss@sec.gov
           Email: Lot@sec.gov
           Email: Okeefej@sec.gov